Kimminau Law Firm, PC
32 North Church
Tucson, AZ  85701
(520) 887-7816
State Bar No. 012229

Chris J. Kimminau, Esq.
Attorney for Dino Sisneros

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>DINO SISNEROS,<br><br>                    Defendant. | Case Nos.: CR 11-0794-TUC-RCC-CRP<br><br>**DEFENDANT'S <u>FIRST AMENDED</u> OBJECTIONS TO THE PRESENTENCE REPORT**<br><br>Assigned to Hon. Rainer Collins |

Comes now Defendant, DINO SISNEROS, by and through his attorney, undersigned, and pursuant to Rule 32(f) &(i)(3)(B) of the federal rules of criminal procedure hereby lodges the following objections to the presentence report of November 22, 2016 and requests the probation officer address them and the Court rule on any unresolved disputed portions of the presentence report prior to sentencing Mr. Sisneros.  This is an amendment of Doc. 949. Additions or changes are **<u>underlined</u>**.  There are no deletions.

**<u>Objection to Defendant's release status:</u>**

On page one of the presentence report, the probation officer erroneously states "Sisneros…has served only four days presentence detention in connection with the instant offense."  But at the time of sentencing on December 19, 2016, Defendant will have served <u>1,109</u> days of presentence detention because on December 6, 2013, this Court revoked his conditions of release. ***Doc. 430***.

**<u>Objections to Part A, The Offense:</u>**

The defendant objects to and disputes all factual assertions of the presentence report not contained in the agreed statement accepted by the Court during the change of plea proceeding. ***Doc 853 pp 11-13***.  Specifically, Defendant objects to the statements in the following paragraphs and asks they either be stricken from the presentence report unless the government proves them by a preponderance of the evidence at a contested hearing.  <u>U.S. v. Showalter</u>, 569 F.3d 1150, 1159-60 (9th Cir. 2009) directs:

> '[T]he district court may rely on undisputed statements in the PSR at sentencing.... However, when a defendant raises objections to the PSR, the district court is obligated to resolve the factual dispute, and the government bears the burden of proof.... The court may not simply rely on the factual statements in the PSR.' *United States v. Ameline,* 409 F.3d 1073, 1085-86 (9th Cir.2005) (en banc); *see also* Fed.R.Crim.P. 32(i)(3)(B) (requiring court to rule on disputed matters at sentencing).

*See also* <u>U. S. v. Williams</u>, 41 F.3d 500-502 (9th Cir.2000) [Court may abuse its discretion if it does not permit a party to challenge the reliability of hearsay evidence].

¶2    Information regarding revocation of the defendant's release (***Doc 430***) should be added to this paragraph.

¶4    <u>Defendant and his wife never solicited owners. Instead, contact was made with listing real estate agents. Defendant hired real estate attorney, Mike Monroe, with whom he had a relationship dating back to 2001, to draft documents to be used to ensure he would be able to lawfully accomplish his objectives.  Later, various underwriters insisted that the forms were too long and instead required addendums to the standard real estate purchase contract.</u>  Defendant objects to the final sentence of this paragraph.  It is false that "Mrs. Sisneros would pay a portion of her proceeds to Michael Quiroz."  Any money changing hands with Quiroz were re-payments of personal loans back and forth between Quiroz and Melissa Sisneros.

¶5    Defendant objects to the characterization, "recruited several straw buyers." Sisneros recruited no one and none of the persons the government has characterized as "straw buyers" themselves feel they were straw buyers.  The term "straw buyers" does not appear in the factual basis of the plea.  Each buyer made direct payments to the mortgage holder (or its servicing agent) on each transaction.  For example, in a transaction involving Theresa Coyne, Mr. Sisneros would pay Mrs. Coyne rent and she would then (presumably) pay the mortgage. None of the persons were promised they would receive a "fee" at closing.  None of the buyers were led to believe they were "lending their credit" to purchase the properties.

¶6    Same objection.  These persons were not straw buyers.  Mr. Sisneros did not "recruit" them.  In fact, it was Chad Ayers who reached out to Mr. Sisneros regarding his grandparents, Thomas and Mary Cooke, not *vice versa*.

¶7    Defendant objects to the statement "Quiroz falsified various items on the loan applications so the buyers would qualify for the loans" to the extent it implies he had knowledge of or directed Quiroz to do so.  Defendant objects to and disputes the final sentence of ¶7.  <u>Also, to the extent this paragraph infers Defendant "referred" buyers to Quiroz, that is false. Quiroz was friends or acquaintances with the almost all of the buyers.</u>

¶8    Defendant objects to and disputes the statement, "The only source of income for the Sisneroses during this conspiracy was from the cash back mortgage fraud scheme."  Though the Sisneros created "Straight Rate Paint and Remodeling," it absolutely was not a "fictitious business."  Defendant also contends he had a legitimate source of income.  He was remodeling properties and creating new value in them and then selling them at fair market value.  (The Court will note the government has **never** asserted that any appraisal related to any of the transactions

3

in this case were fraudulent).  Defendant objects to the assertion there were "fraudulent invoices from Straight Rate Painting and Remodeling." There were not.

¶9   Defendant objects to the term "straw buyers" and asserts the indictment references not 20 transactions but 13 purchases and 4 refinances/home equity loans.  Though many of the properties, indeed, "went into default" in every single case it was at least a year (and in some cases severeal years) after a transaction closed that the property went into default.  The cash received by the Sisneroses was $2.9 million and not $3.6 million.  Finally, there were no "kickbacks" to Quiroz.  Any money received by Quiroz from the Sisneroses was for the repayment of a personal loan by him to them.

¶11   Defendant objects to the hearsay statements of Andrea Villalba and any statements she may have attributed to him.

¶13   Defendant agrees the court should adopt the negotiated restitution amount of $2,606,745.60.  However, Defendant disputes he is "arguably accountable for additional losses and restitution."  Defendant also objects to the definition of "loss" articulated by the probation officer.  "Loss" should not be defined as the "difference between the original loan amounts and the amounts for which the properties later sold."  The post-foreclosure sales price of the properties was effected by market forces beyond Defendant's control, including industry-wide fraud on the part of each the listed victims.  Further, after the warrant was executed in this case, the government interfered with the listings of the subject properties by contacting the listing broker's legal department (Coldwell Banker), misinforming personnel that Mr. Sisneros was "a drug dealer and a money launderer" and as a result Coldwell Banker dropped each of the listings. It is indisputable that if the subject properties were sold at even 80% of their appraised values (and the government has never asserted that any of the appraisals in this case were fraudulent)

4

there would have been no "loss," even as defined by the probation officer.  Additionally, when higher end homes are sold, the lender itself conducts an independent appraisal, which amounts to another measure of proof the homes values were not inflated on account of any misconduct on the part of Defendant.

**Objections to the Offense Level Computation:**

¶17  Defendant objects to the loss amount listed, "$4,939,624, as stipulated on the plea agreement," because the loss amount stipulated in the plea agreement, though greater than "$3,500,000," *see **Doc. 852, p. 3*** certainly was not "$4,939,624," especially given the stipulated restitution amount of $2,606,745.60."

¶18  For purposes of an accurate offense level computation, despite Defendant's agreement the loss was greater than $3,500,000, the court should find, absent evidence to the contrary, the loss is not more than the $2,606,745.60 stipulated to as restitution.  Hence, to the base level of 7, 16 levels (not 18) should be added under § USSG 2B1.1(b)(1)(I), yielding a base offense level of 23.  Further, § USSG 2B1.1(b)(16) does not apply because the "gross receipts" received by Defendant from Chase (as opposed to his co-Defendant, Melissa Sisneros) was <u>not</u> greater than $1 million.

¶23  The adjusted offense level (subtotal) should be 23.

¶27  With a 3 level downward adjustment for acceptance of responsibility (as listed in ¶'s 25 & 25) the total offense level should be 20, not 24.

**Objections to Part B, the Defendant's Criminal History**

¶32  The presentence report attributes a criminal history score of four to Defendant, but his criminal history is actually one (for the conviction from a 1996 Arizona DUI arrest).  Defendant's conviction on the parallel case before Judge Jorgenson, for which he was indicted

after this case, cannot be used against him in this case to assign three criminal history points because that conviction does not meet the definition of "prior sentence" under §USSG 4A1.2(a)(1).

That section provides, "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense." Defendant's conduct was "part of the instant offense." To be sure, the government has noticed all of the evidence from Judge Jorgenson's case as "inextricably intertwined" with this case. ***Doc. 390***, ***Doc 414***. The government has never withdrawn these notices. What is more, in its January 21, 2014 *Sealed Order*, this Court determined the bulk of the noticed evidence from Mr. Sisneros' case before Judge Jorgenson <u>would be</u> admissible in this case if foundational prerequisites were met.

The government's notices of "inextricably intertwined evidence" and the Court's ruling on the topic, contributed, in part, to Defendant's decision to accept the government's plea offer. It would therefore be improper for this Court to change course at this stage of the case and determine the conviction before Judge Jorgenson qualifies as a prior sentence for purposes of criminal history points. This is especially true given that during oral argument before the 9th Circuit on the appeal of the case assigned to Judge Jorgenson, the government admitted it could not have convicted Mr. Sisneros without the other act/inextricably intertwined evidence from <u>this</u> case. Hence, if the evidence in both cases is inextricably intertwined, the conviction from the case assigned to Judge Jorgenson cannot rightfully be assigned three criminal history points.

<u>As to the factual recitations within ¶32, Defendant objects to and disputes, "[g]enerally, the individuals were not informed there were other lien holders on the properties" and asserts all lenders were properly informed.  Also, none of the properties were overvalued</u>

because they had valid appraisals associated with them and at trial, the government never asserted differently.  In fact, two of the lenders (Quijada and Wade) had significant real estate experience while the third (John Rodgers) had his wife handle the entire transaction and she was a former mortgage loan officer and real estate agent. Defendant agrees "some money obtained from these individuals was used to purchase two of the properties" involved in this case, which further proves Judge Jorgenson's case is "related conduct" in this case.  However, Defendant objects that "none (of the money loaned in Judge Jorgenson's case) was used in legitimate real estate transactions, but asserts the majority of it was used in legitimate real estate transactions. Defendant also objects to the characterization of the owners as "straw buyers."  Further, Defendant objects to the amount loaned being "$1, 028,000" and asserts the amount loaned was less than $1.0 million.  Defendant also objects that "it appears only a small amount was ever paid back" and asserts substantial amounts were paid back.

¶33  The total criminal history score should be 1 point, not 4.

¶34  Based on one (1) criminal history point instead of four (4), Defendant's criminal history category should be I, not III.

**Objections to Part C, Offender Characteristics**

**Personal and Family Data**

¶40  Defendant has been in custody since October, 2013 and hence he does not "presently live in a rental home on Tucson's north side."  In fact, though Defendant has friends with whom he can temporarily reside, he is essentially homeless since his wife, co-defendant, Melissa Sisneros, cut off all contact with him on the day he pled guilty to this offense and changed her FaceBook profile status to "single" and abandoned the last name "Sisneros."

¶42  Defendant objects to the inclusion of the sentence, "He added that his wife suspects he may have engaged in an affair prior to his incarceration" as extraneous to this Court's sentencing decision. <u>Defendant would request the following be added: he did not have an extramarital affair; Melissa Sisneros had ongoing and continuous positive contact with him while incarcerated on 4:12-cr-00174-CJK until the day the couple entered a change of plea in this case, immediately after which Melissa Sisneros changed her FaceBook profile to list herself as "single" and goes by the name "Melissa Monroe," which is not her maiden name.</u>

¶43  Defendant did not add or intend to imply he would "resume his career in the real estate industry." Defendant intends to do home painting and improvement or become a real estate construction worker upon his release from prison.

**Mental and emotional health**

¶45  It should be added, Defendant was attacked by Mexican Nationals while in the Florence Correctional Center in Florence, AZ and suffered physical injury and lingering emotional harm. He is also experience ongoing mental/emotional difficulties from his wife, co-defendant, Melissa Sisneros, cutting off contact with him (including not permitting him to have contact with his granddaughter) immediately after their change of plea proceeding in this case.

**Substance Abuse**

¶47  Information should be added that the two positive marijuana tests were from usage prior to Defendant's March 7, 2011 arrest. All subsequent drug tests while on pretrial release were negative.

**Employment Record**

¶51  The clause, "it appears the customer on three of the seven contracts was a victim in 4:12-cr-00174 CJK" should be stricken. Alternatively, it should be amended to include that

8

the customer was the wife of a victim.  The reference is to Diane Rodgers, wife of John Rodgers, who loaned Defendant money in the case before Judge Jorgenson.  Diane did not make the loan.  The funds were the sole and separate property of John Rodgers.  Diane Rodgers testified at trial that she did not consider herself a "victim" of any crime by Dino Sisneros.  *See **Doc. 347*** in 4:12 cr-00174 CJK, JT, Day 6, p.133.  <u>John Rodgers testified and explained he felt nothing else occurred in this case other than that his investment was lost.  He provided no evidence suggesting Defendant engaged in any misconduct.</u>  ***Doc 349*** in in 4:12 cr-00174 CJK, JT, Day 8, <u>p.68 et. seq.</u>

The following should also be added, "Sisneros contacted customers and reported they did not want to have their biographical data released to the probation department."

Finally, the reference to taxes should be stricken.  Alternatively, to cure the probation officer's selective memory, it should be added that "Sisneros' explained his attorney, Bruce Huerlin, advised him, given that he was under investigation by the IRS, he should not pay taxes until presented with a tax bill by the IRS." <u>This part of the conversation between the probation officer and Mr. Becker was promised to be confidential by Mr. Becker.</u>

¶52  Sisneros objects to the factual assertion, reference Straight Rate Painting and Remodeling, "However, investigators believe it was a fictitious business that generated no income during that period (2002-2007)."  First, any investigator's "belief" is irrelevant to sentencing.  Second, Straight Rate Painting and remodeling was not a "fictitious business that generated no income during that period."  The sentence should be stricken or the government should be required to prove the allegation.

¶53  The last two sentences of the first paragraph are inaccurate.  Defendant did not provide a vacation rental agreement as proof of employment, although the government has

disclosed records showing the Sisneroses had over $150,000.00 in annual income from vacation rentals.  Instead, Defendant provided a consulting agreement between himself and Regenedyne, a green energy corporation, regarding a wind turbine project in Sierra Vista, AZ.  Co-defendant, Michael Quiroz, was not involved in this project.  Defendant objects to the final sentence of this paragraph and asserts both Powerhouse Investments and Bayou Investments were not fraudulent.  This sentence should be struck from the Presentence Report unless the government proves the assertion prior to sentencing.  In any event, the Florida parcel was 101 and not 137 acres.

**Objections to Part D, Sentencing Options**

**Custody**

¶59  Because the base level of the offense is actually 20 and Defendant is in criminal history category I, the guideline imprisonment range is 33-41 months, USSG § 5A.

¶60  Judge Jorgenson did not find that the fraud conduct in this case was unrelated to the conduct in the case assigned to her.  Rather, she found all five of the transactions which are encompassed within Defendant's guilty plea in this case, and which the government presented in Judge Jorgenson case, were inextricably intertwined with the case assigned to her.  *See **Doc. 37**, p. 2, in 4:12-cr-00174 CJK ["As argued by the government, the evidence is inextricably intertwined with the offenses charged in this case…the law in this circuit clearly allows such inextricably intertwined evidence and there is no case law prohibiting it in the circumstances presented in this case"].  In its sentencing memorandum in Judge Jorgenson's case, the government argued Sisneros' conduct in this case was "relevant conduct" for purposes of sentencing in that case.  *See **Doc. 308, pp 4-9** in 4;12-cr-00174 CJK. ["During the trial, the government demonstrated that the defendant engaged in mortgage fraud.  Such evidence was admitted…because (it) was 'inextricably intertwined' with the investment fraud scheme.  The

10

defendant used victim investor money to commit mortgage fraud"].  It is disingenuous for the government to change positions now.

Additionally, Mr. Becker, the probation officer who authored the presentence reports in both cases, also took the position the conduct in this case was "related conduct" in Judge Jorgenson's case (4:12-cr-00174-CJK).  *See* PSR in that case, ¶22.  At sentencing in that case, Judge Jorgenson essentially determined the conduct in this case was related to her case but it would be unduly harsh to add offense levels for the money involved in this case to the base offense level for which Defendant was found guilty in her case.  She remarked:

> I think that although it was clearly relevant at trial to show where this money went to show the defendant's intent and, you know, that the acts were in a sense closely related that way, I really think that what Mr. Sisneros did in those other cases was not the same course of conduct—although it was related—not part of a common scheme or plan in this case…So I think it was clearly relevant during the trial.  But for purposes of sentencing…I also have concerns that applying that guideline to all the other conduct that was admitted in this trial really does overstate what the advisory guideline should be in this particular case…[D]efendant is pending trial on those very matters…

*Doc*. *331*, p.53-54 in 4:12-cr-00174-CJK.  So, it is quite clear the conduct in this case was "related conduct" under USSG in Judge Jorgenson's case sufficient to trigger USSG §5G1.3(b)(2) [which calls for a concurrent sentence] in this case.  Judge Jorgenson merely wished not to impose a disproportionate sentence in her case, remarking that if she formally found the case conduct in this case to be relevant conduct in her case, it would "have a very large impact on the 2B1.1 loss category." *Id.*, p.54.

Finally, the fact that the conduct in <u>this case</u> was not formally determined by Judge Jorgenson to be relevant conduct in <u>her case</u> does not mean that the conduct in <u>her case</u> cannot formally be found to be relevant conduct in <u>this case</u>.  Review of the *Background* note (following *Application Note 9*) to USSG §1B1.3 confirms this.  We read:

> Subsections (a)(1) and (a)(2) adopt different rules because offenses of the character dealt with in subsection (a)(2) (i.e., to which §3D1.2(d) applies) often involve a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing. For example, a pattern of embezzlement may consist of several acts of taking that cannot separately be identified, even though the overall conduct is clear.

In both cases, the overall conduct is now clear.  It would have been harder for Judge Jorgenson to reach a definitive conclusion about "related conduct" back in October, 2013 than it is for this Court now (more than 3 years later). Now, it is clear there was only one "common scheme or plan" or at least that the conduct in Judge Jorgenson's case was part of the "same course of conduct" of this case.[1]

The 9th Circuit explained in U.S. v. Nichols, 464 F.3d 1117, 1123 (9th Cir. 2006):

> 'For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.' *§ 1B1.3, cmt. 9(A).* 'Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or on-going series of offenses.' *Id.* at cmt. 9(B). The determining factors are 'the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.'

There certainly was "common accomplices, common purpose [and] similar modus operandi" between the cases.  The 10th Circuit further explained "same course of conduct" as:

> The term looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be connected together by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable behavior pattern of specified criminal activity. Further, 'a change in the operation's modus operandi ... need not

---

[1] Of course, the problem in Judge Jorgenson's case was the introduction of evidence of so-called mortgage fraud from this case, which was irrelevant and prejudicial to a fair trial in Judge Jorgenson's case.  That was a central focus of the appeal, the briefs of which will be attached as exhibits to Defendant's Sentencing Memorandum.

affect the same course of conduct inquiry when the defendant's continued involvement in the specified type of criminal activity... remains evident.

U.S. v. Hamilton, 587 F.3d 1199, 1221 (10th Cir. 2009) (internal quotes and citations omitted).

Here, we clearly have two prosecutions "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or on-going series of offenses," temporal overlap, and "an identifiable behavior pattern of specified criminal activity." Both cases are wire fraud cases involving loans to support the acquisition, refinancing and sale of higher end single family homes in the Tucson area.  The only factual distinctions of any significance are that this case involved commercial lenders and written applications to secure the loans and Judge Jorgenson's case involved individual lenders and oral representations to secure the loans.

Certainly, the government will admit, the money loaned in 4:12 cr-00174-CJK is directly traceable to at least five of the 17 transactions originally charged in this case.  In fact, in many instances, the loans in 4:12-cr-00174-CJK formed the basis of part of the conspiracy to which Defendant has pled guilty, to wit, "(4) false representations concerning the source of a down payment of cash to close a transaction" ***Doc. 1***, ¶,14.  Relatedly, the money loaned in 4:12-cr-00174-CJK was repeatedly used by Defendant and/or his wife to make required monthly mortgage payments on many of the 17 property transactions in this case.  ***Doc 308*** in 4:12-cr-00174-CJK, pp 4-5.  In fact, the money loaned was also used to make material improvements and regular monthly maintenance on the properties.  The connection isn't just tangential, it is direct.

13

Accordingly, considering all of the above and given the discussion pertaining to ¶32 *supra*, the provisions of USSG § 5G1.3(b) **are** applicable and Defendant must be sentenced concurrently with 4:12-cr-00174-CJK.

¶73   Defendant's analysis of the guideline computation produces an advisory prison range of 33-41 months (with a criminal history category of I), not a range of 63-78 months (with a criminal history category of III) as determined by the probation officer.  The parties have indeed stipulated to a custody range of 0-36 months, but under defendant's analysis, the stipulation corresponds to no downward departure except at the very top of the range, which corresponds to downward departure of just one level.

¶'s 74 & 76.  These paragraphs should be stricken as Defendant contends he did not engage in identity theft.  The court must sustain this objection unless the government can prove identity theft as sentencing.  <u>U.S. v. Showalter</u>, 569 F.3d 1150, 1159-60 (9th Cir. 2009).

¶77   This paragraph (a variance from the advisory guideline range) will be addressed in Defendant's forthcoming *Sentencing Memorandum*.

**<u>Objections to the Sentencing Recommendation</u>**

**<u>Justification</u>**

Because the Defendant will have been in custody for 36 months and 14 days on the date presently set for sentencing (December 19, 2016) and because the stipulated sentence tops out at 36 months, the Court must enter judgment and sentence showing Defendant has fully served any sentence of imprisonment it imposes.  *See* 18 U.S.C § 3585(b).

Again, the reference to identity theft should be stricken absent proof the conduct occurred.

14

**<u>Special Conditions</u>**

A solitary alcohol related offense (misdemeanor DUI) that is 20 years old is hardly grounds to impose a condition of supervised release that Defendant abstain from the use of alcohol and Defendant objects to such a condition. <u>Additionally, Magistrate Judge Pyle amended Defendant's conditions of release in this case and specifically permitting him to consume alcohol and the judgment in 4:12-cr-00174-CJK does not contain a prohibition on the use of alcohol.</u> Similarly, that Defendant twice tested positive for marijuana during the first 16 days of his release under pretrial services supervision does not warrant a condition of supervised release he participate in substance abuse treatment, especially given that he remained at liberty thereafter for greater than 2 ½ years without testing positive for drugs and the two positive tests were from pre-arrest usage.

Defendant is not a "self-admitted tax resister" and hence no special condition requiring him to file timely and accurate tax returns is justified.

Any of any criminal monetary penalty due should not commence until 90 days after Defendant's release from confinement on 4:12-cr-00174-CJK.

RESPECTFULLY submitted this 9th day of December, 2016

/x/ Chris J. Kimminau

_____

Chris J. Kimminau, Attorney for Dino Sisneros

Copy electronically delivered this 9th day of December, 2016 to:

Jon Granoff
Assistant United States Attorney

Copy emailed this 9th day of December, 2016 to:

Wayne Becker, Senior U.S. Probation Officer
Wayne_Becker@azd.uscourts.gov

15