Kimminau Law Firm, PC
32 North Church
Tucson, AZ  85701
(520) 887-7816
State Bar No. 012229

Chris J. Kimminau, Esq.
Attorney for Dino Sisneros

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>DINO SISNEROS,<br><br>          Defendant. | Case Nos.: CR 11-0794-TUC-RCC-CRP<br><br>**SINSEROS' REPLY TO GOVERN-MENT'S RESPONSE TO SISNEROS' OBJECTIONS TO THE PSR**<br><br>Assigned to Hon. Rainer Collins |

Comes now Defendant, DINO SISNEROS, by and through his attorney, undersigned, and hereby provides this reply to the government's response (*Doc. 961*) to his previously filed amended objections to the PSR (*Doc. 951*).

**Paragraph 4:**

While it is true "some of the properties were listed for sale for a period of time without being sold and then subsequently sold…at a much higher price," no property was sold to a "straw buyer," as the government asserts.  The higher prices were due either to physical improvements or market value increases that had nothing to do with misconduct on Mr. Sisneros' part. The misconduct in this case was in loan applications, not sales prices.

Once again, the government's "example of how the process was accomplished" using the Panorama home leaves us puzzled.  First, it is false that Robert Irwin was told he would be paid $10,000.00 for each home he purchased (unless the government is referring to some written terms of an agreement between himself and Mr. Sisneros which documented a legitimate

1

agreement. Dino was advised by counsel, and attempted to, put everything in writing). Nor was he told he would "not have to be responsible for mortgage payments." He was told he would receive rental payments which could be used for mortgage payments. Additionally, the payments to Quiroz were not "kickbacks;" but the government is free to try to prove they were at sentencing. Most importantly, the fact the property did not initially sell for $399,900 but later sold for $550,000 is not explained by the government. Was there a bogus appraisal involved? If not, did the property sell at its appraised value? If so, where is the fraud? Perhaps the lender colluded with the defendants?

The government's example is stillborn. There were material misrepresentations in loan applications but not price fraud.

**Paragraphs 5 and 6:**

Defendant acknowledges the term "straw buyers" appears on page 12 of his plea agreement, but maintains there were no "straw buyers" in this case. The actual applicable clause in the plea agreement states, "material false statements were submitted on behalf of **the loan applicants _OR_** straw buyers." *Doc. 852*, p. 12, emphasis added. Hence, Defendant agrees there were "loan applicants" **or** "straw buyers," but affirmatively tells this court there were only "loan applicants," and **no** straw buyers. The existence of "straw buyers," whatever that undefined term means, will need to be proven by the government prior to sentencing. *See* Fed.R.Crim.P. 32(i)(3)(B) and U.S. v. Showalter, 569 F.3d 1150, 1159-60 (9th Cir. 2009), "when a defendant raises objections to the PSR, the district court is obligated to resolve the factual dispute, and the government bears the burden of proof."

As to the Cookes, the government now admits they were not recruited by Defendant. Defendant never met the Cookes. Dino acquiesced to the Cookes because Chad Ayers affirma-

tively told Dino he had a "power of attorney" on behalf of the Cookes (Ayers' grandparents). The Cookes were not "straw buyers" and even if the government can establish evidence they were (and again, the term is not defined) certainly the government cannot prove Defendant acted with knowledge the Cookes were "straw buyers."

Finally, Larry Steers was referred to Dino. Steers personally told Dino he was buying Pontatoc and Eastland as investment properties and rented out the units on Eastland, later listing the Eastland property and selling it for a profit. As to Pontatoc, it went into foreclosure because the rental payments Dino made to Steers were used by Steers for his own purposes and not used to pay the mortgage. Mrs. Steers admitted this in an interview with the IRS. Further, Mr. & Mrs. Steers **lived in** the La Oesta property as an owner/occupant (and are believed to still live there). Under any definition, straw buyers do not live in the subject property for years and years.

**Paragraph 7:**

The government quotes from Sisneros' plea agreement (***Doc. 852***, p. 12), but read carefully, Sisneros hasn't admitted he knew Quiroz was submitting false applications and other documents on Sisneros' behalf, though he now recognizes that happened. He reiterates, there never was an agreement between himself and Quiroz that Quiroz would place false information on any loan application.

**Paragraph 8:**

The government is free to attempt to prove Straight Rate Painting and Remodeling was a "fraudulent business" that submitted "fraudulent invoices" to qualify for mortgages, but Defendant again asserts the business was fully legitimate and produced no fraudulent invoices.

**Paragraph 9:**

See the comments under paragraphs 5 & 6 above.

**Paragraph 11:**

The government's characterization of what Villalba "testified generally about" has no weight.  The Court is referred to <u>Exhibit 1</u> of Defendant's Sentencing Memorandum (Defendant's Opening Brief in the appeal of Judge Jorgenson's case, Argument 6 therein).  However, should this Court consider it, the government's reference to Villalba's testimony in Judge Jorgenson's case is a further concession by the government the evidence from that case is **<u>intertwined in this case</u>** and should be considered "relevant conduct" for purposes of a mandatory concurrent sentence.

**Paragraphs 13 and 17:**

The Court is directed to the Restitution section of Defendant's *Sentencing Memorandum*.  Defendant knows what he stipulated to but asserts the Court has an independent statutory duty to determine restitution.

As to property values being inflated; they were not.  Once again, the government has never asserted the values of the property were falsely inflated via bogus certified appraisals.  If not through false appraisals, how then were they inflated?

This case is now over five years old.  The government is invited to show the property values on any of the properties involved in this case were inflated, if it can do so, but the government surely has no evidence to support its repeated empty assertions.  In fact, the government's response makes the following nonsensical statement, "Regardless of any appraisal, the sales price for these transactions was clearly falsely inflated because the sales were not legitimate." *Response* at 5, lines 6-7. That is a completely illogical statement; a *non sequitur*.

The government is also free to attempt to prove all the other assertions it lists in its response to paragraphs 13 and 17.  The Defendant is especially interested for the government to come forth with evidence, undisclosed over these past five years, that any purchaser was told he/she/they "would not be responsible for making mortgages payments."  That **never** happened.

Finally, the "more than $1,000,000 in gross receipts from one financial institution" adjustment is no longer factually supported since the appearance of the FDIC as a victim.

**Paragraph 32:**

Transparently seeking to convince this court it is proper to sentence Defendant consecutively, the government is recalcitrant in its newfound position, adopted only in the 11th hour and only for purposes of Dino's sentencing, that the conduct from Judge Jorgenson's case is **not** intertwined in this case.  It furthers its subterfuge referring to the admission of evidence in Judge Jorgenson's case as "other act" evidence (p.5, line 18) despite Judge Jorgenson and the government both considering the evidence "inextricably intertwined" at the time.  The Court should not bite on this change of course but instead hold the government to live up to the now "inconvenient truth"[1] to which it heretofore clung.

The government ends by stating the obvious, as if it is pivotal, namely, "these victims are separate and distinct from the financial institutions and other entities who were victims in this case" (p.6, lines 1-2).  But that is no point at all.  All the victims in both cases are "separate and distinct" from one another.  However, they are all victims of the same scheme/course of conduct.

**Paragraph 53:**

As to Bayou Investments, LLC and Powerhouse Investments, LLC, the government

---

[1] The reference is to the Al Gore *Global Warming* documentary.  By analogy, the government, for five years, has espoused global warming, but suddenly now is a naysayer.

has presented no evidence to prove its allegations these companies, recognized by the Arizona Corporation Commission, are "fraudulent." These companies have never been found by any administrative agency or court to be "fraudulent."

### Advisory Guidelines Calculation:

Upon further research, Sisneros agrees, as pointed out in his *Sentencing Memorandum*, the guidelines calculation should reflect, under the Grouping guideline, the loss from Judge Jorgenson's case. However, the Court must honor the sentencing range (0-36 months) stipulated to by the parties in the plea agreement.

### Defendant's Recommended Sentence:

Because the conduct in both case meets both definitions of relevant conduct, Defendant must be sentenced concurrently.

### Defendant's Failure to File Income Taxes:

Still, the government has not shown Sisneros owed taxes or that, if he did, he willfully failed to file tax returns. Further, the government has not refuted Sisneros' assertion he did not file returns under advice of counsel pending the IRS presenting him with a tax bill, which it never did. However, given Judge Jorgenson's order that Sisneros file timely and accurate tax returns as a condition of supervised release in her case, Sisneros does not object to a parallel order in this case.

Additionally, the government apparently agrees Defendant should not have a condition of supervised release prohibiting him from using alcohol. In fact, 18 U.S.C. 3563(b) only authorizes a court to order a defendant to "refrain from excessive use of alcohol." This Court should

///

///

impose, if at all, a condition of supervised release only prohibiting excessive use of alcohol.

The bottom line is, the government bears the burden of proof on all objections lodged by the defendant to items in the presentence report. U.S. v. Showalter, 569 F.3d 1150, 1159-60 (9th Cir. 2009). If the government fails to prove the truth of the matters under objection, they should be from the PSR. Alternatively, the Court may affirmatively declare "the court will not consider the matter in sentencing." Rule 32(i)(3)(B).

RESPECTFULLY submitted this 30th day of December, 2016

/x/ Chris J. Kimminau

Chris J. Kimminau, Attorney for Dino Sisneros

Copy emailed this 30th day of December, 2016 to:

Wayne Becker, Senior U.S. Probation Officer
Wayne_Becker@azd.uscourts.gov